CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
APR 2 5 2007
JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| L. MERIWETHER GERMAN, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5:06CV00119 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| STEVE FOX, et al., | ) | By: Hon. Glen E. Conrad |
| | ) | United States District Judge |
| Defendants. | ) | |

L. Meriwether German filed this civil rights action under 42 U.S.C. § 1983 against the Shenandoah Valley Travel Association ("SVTA"); Steve Fox, the President of the SVTA; John Shaffer, a former President of the SVTA; and Alisa Bailey, the President of the Virginia Tourism Corporation (VTC). German alleges that his employment with the SVTA was terminated in retaliation for exercising his First Amendment right to free speech. German also asserts a claim under state law for tortious interference with his employment contract. The case is presently before the court on the defendants' motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the following reasons, the court will grant the defendants' motions.

### Background

The following facts, which are taken from German's complaint, are accepted as true for purposes of the defendants' motions. See Estate Constr. Co. v. Miller & Smith Holding Co., 14 F.3d 213, 217-218 (4th Cir. 1994).

The SVTA, based in New Market, Virginia, is a private, non-profit organization that promotes tourism in thirteen Virginia counties and three West Virginia counties. German was previously employed as the SVTA's Director of Public Relations and Membership. His

responsibilities included soliciting members, communicating with the media, writing news releases, and "work[ing] with state and local officials." (Compl. ¶ 9.)

In May of 2006, the Interstate 81 welcome center in Clear Brook, Virginia was temporarily closed for renovations. A temporary welcome center was established in Winchester, Virginia, approximately two miles from Interstate 81.

During an SVTA membership meeting on June 22, 2006, SVTA members voiced a variety of complaints regarding the temporary welcome center. The complaints were directed to Virginia State Senator Emmett Hanger, who was in attendance at the meeting.

Several days after the membership meeting, Senator Hanger's legislative assistant called German to express the Senator's concerns regarding the temporary welcome center. In response, German sent an email to Senator Hanger, in which he agreed with the Senator's concerns and suggested potential solutions:

> Hi Emmett & Holly....
>
> To recap my conversation with Holly last evening, both our Tourist Information Center here in New Market and the Winchester-Frederick County Visitor Center have received numerous complaints about not being able to find the relocated I-81 State Welcome Center in downtown Winchester. The situation was of course detailed to Emmett at our SVTA June 22 Massanutten WaterPark meeting.
>
> I went to Winchester Monday (July 10), and personally checked out the situation. There is one sign for the relocated Center on I-81 telling visitors to now use Exit 213B, and there is a sign directing folks off the exit ramp and another in several tens of a mile to then to turn right onto Pleasant Valley Road. There are then virtually no signs for at least half a mile until one directs them to turn left on to Cork Street.

2

There are then no signs for at least several downtown blocks until they are directed to turn onto Cameron Street...... that's it, NO MORE SIGNS..... IT IS IMPOSSIBLE TO FIND THE FACILITY......I drove Cameron Street twice to make sure.

Even if the facility were signed properly, it is ridiculous to expect visitors to drive some 2 miles off the Interstate through a foreign, unknown downtown area when they were originally expecting to receive comprehensive tourism information on or adjacent to the Interstate.

The relocated state facility is in a downtown Loudoun Mall storefront (!!!!), and I am pretty sure one has to pay to park if no one is able to find it.

While talking to the Travel Counselors at the Winchester-Frederick Co. Visitor Center, they vociferously noted how many frustrated and angry visitors came in every day unable to find the center. I personally witnessed two such complaints during my brief visit. The bottom line is that this is the height of the Commonwealth's and the Valley's tourism seasons, and the public is not being served, and they are angry. The current location is also a significant waste of the taxpayers' dollars. Virginia is receiving a huge public relations black eye, and the situation needs to be addressed and corrected immediately.

Solution: It is my understanding that the Winchester-Frederick Co. CVB offered VDOT and the Virginia Tourism Corporation free space adjacent to their own visitor center to locate a trailer there, but this offer was turned down. This needs to be revisited. Another solution would possibly be [to] have the State Travel Counselors work side by side [with] the Winchester-Frederick Co. Travel Counselors at the existing visitor center.

Thanks very much for your concern and interest in remedying this situation.

Best regards,

Meriwether

Shenandoah Valley Travel Association
P.O. Box 1040
New Market, VA 22844

3

540-740-3132
www.visitshenandoah.org

(Compl. Ex. A.) Liz Sherrer-Lewis, the Executive Director of the SVTA, was copied on the email.

On July 13, 2006, German telephoned Alisa Bailey, President of the Virginia Tourism Corporation ("VTC")[1], to pass along the concerns regarding the temporary welcome center. Bailey informed German that the VTC could not contact the Virginia Department of Transportation ("VDOT") on every issue, but that she would have another VTC employee, Bobbie Walker, look into the matter.

On July 14, 2006, Senator Hanger sent an email to Jake Porter, a VDOT employee, reiterating the complaints that his office had received regarding the temporary welcome center. The following day, Porter forwarded the email to Walker.

On July 17, 2006, German sent an email to Bailey and Connie Sorrell, a VDOT employee, expressing the SVTA's concerns regarding the temporary welcome center. The email states, in pertinent part, as follows:

> Hi, Alisa and Connie....
>
> . . . .
>
> . . . .
>
> The Shenandoah Travel Association is quite concerned about the relocation of the I-81 Clear Brook Welcome Center into downtown Winchester. Put quite simply, the public IS NOT BEING SERVED. Even worse, dozens of visitors and Virginia taxpayers

---

[1] German describes the Virginia Tourism Corporation as a state entity that "works with the tourism industry within the Commonwealth of Virginia to help support and expand tourism within the State." (Compl. ¶ 6.)

4

Case 5:06-cv-00119-GEC-BWC   Document 29   Filed 04/26/07   Page 4 of 15   Pageid#: 195

are being made extremely angry and frustrated on a daily basis by the current situation. It's literally a public relations disaster for the Commonwealth.

Welcome center visitors expect to find a well marked facility close to the interstate, with free parking and rest rooms. NONE OF THESE FOUR SIMPLE CRITERIA are being provided. The current facility is marked with one solitary sign on the interstate some 3 or four miles from the exit (313B). Sporadic signing then directs visitors PAST THE ENTRANCE to the existing . . . well-signed Winchester-Frederick County Tourist Information Center. The Welcome Center signing CEASES COMPLETELY when folks are directed to turn onto Cameron Street. As of July 10, IT WAS VIRTUALLY IMPOSSIBLE to find the facility.

It is ridiculous to expect visitors to drive over 2 miles in a foreign, unknown downtown area when they expect the facility to be close to the interstate. Even then, the signing is poor, the facility is impossible to find. And even if visitors stumble upon it, they HAVE TO PAY TO PARK, and there are NO PUBLIC RESTROOMS. This is nuts!!

And visitors are furious and frustrated..... please feel free to call Natalie Wills, director of the Winchester-Frederick Co. [Convention and Visitor Bureau], for first hand accounts (verbal and written).

The Shenandoah Valley Travel Association's Regional Visitor Center also experiences complaints on a daily basis because people can't find the relocated Clear Brook Center, and drive an extra 50 miles to the next visitor center marked on I-81.

. . . .

. . . .

Thanks very much for your immediate attention to remedying this situation as soon as possible. I look forward to hearing from you.

Best regards,

Meriwether

5

> Shenandoah Valley Travel Association
> P.O. Box 1040
> New Market, VA 22844
> 540-740-3132
> fax: 540-740-3100
> www.visitshenandoah.org

(Compl. Ex. D.) The SVTA's Executive Director was also copied on this email.

On July 18, 2006, several individuals, including Bobbie Walker, Jake Porter, and Natalie Wills, held a meeting to discuss the temporary welcome center. Three days later, Walker informed Bailey by email that Wills would speak with German and express her support for the work of the VTC and VDOT.

On July 31, 2006, German sent another email to Bailey and Sorrell requesting an update on the status of the temporary welcome center:

> Hi, Alisa and Connie.......
>
> We look forward to being updated on how the situation is being resolved . . . .
>
> Thanks very much for your assistance.
>
> Best regards,
>
> Meriwether
>
> Shenandoah Valley Travel Association
> P.O. Box 1040
> New Market, VA 22844
> 540-740-3132
> fax: 540-740-3100
> www.visitshenandoah.org

(Compl. Ex. F.)

6

On August 4, 2006, Sorrell sent an email to Walker and Bailey informing them of a phone call that she received from Garrett Moore at VDOT as a "heads up" about a phone call from Virginia State Senator Russell Potts. (Compl. Ex. G.) Senator Potts informed Moore that he and Senator Hanger had received complaints about the restroom facilities at Virginia Tourism offices, including the temporary welcome center in Winchester.

On August 9, 2006, German sent another email to Bailey and Sorrell requesting an update on the temporary welcome center:

> Alisa and Connie.....
>
> Help..... we would really appreciate getting a response!!
>
> Thanks,
>
> Meriwether
>
> Shenandoah Valley Travel Association
> P.O. Box 1040
> New Market, VA 22844
> 540-740-3132
> fax: 540-740-3100
> www.visitshenandoah.org

(Compl. Ex. H.)

On August 15, 2006, Senator Potts sent an email to Bailey regarding complaints that he had received about the temporary welcome center. The following day, Bailey contacted the Senator's office to set up a meeting.

On August 23, 2006, Dave Parker, a former President of the SVTA, wrote an email to Porter in which he indicated that John Shaffer, another former President, was "not a happy camper" about German's "letter writing campaign." (Compl. Ex. K.) Parker also indicated that

7

Shaffer "works quite closely" with Alisa Bailey, that SVTA President Steve Fox works for Shaffer at Luray Caverns, and that German "will probably be told to cease and desist from this activity without express permission from the SVTA [Executive Committee]." (Compl. Ex. K.)

On August 24, 2006, a meeting was held between Bailey, Sorrell, Porter, Senator Potts, and others. German was not informed of the meeting, even though Senator Potts allegedly suggested that German attend. German alleges that Bailey intentionally omitted him from the meeting, and that she informed Shaffer of her displeasure with German's efforts to bring the issues surrounding the temporary welcome center to the forefront.

Subsequent to the August 24, 2006 meeting, Bailey sent a memorandum to the Office of Governor Tim Kaine at the request of the Governor's Assistant Scheduler. In the memorandum, Bailey reported that Senator Potts was dissatisfied with the temporary welcome center and that he was receiving complaints from the tourism industry in the region.

On or about August 24, 2006, while German was on vacation, Steve Fox met with Cindy Crim, a former SVTA board member, and expressed his displeasure with German's emails to Senator Hanger, Bailey, and Sorrell. Five days later, Fox called German and asked him to explain the emails. At Fox's request, German subsequently provided him with copies of the emails.

On August 31, 2006, Fox terminated German's employment with the SVTA. At the time that German was terminated, Fox allegedly mentioned German's emails and advised German that he had received complaints about them.

8

In the present action, German alleges that Bailey became upset about the scrutiny that the VTC was receiving about the temporary welcome center, and that she "directed and/or encouraged Shaffer to take action to get German to back off and to stop bringing attention" to the issue. (Compl. ¶ 35.) German further alleges that Shaffer contacted Fox and directed him to reprimand German for sending the emails regarding the temporary welcome center. Consequently, German alleges that Fox fired him as a direct and proximate result of the actions of Bailey and Shaffer, and that his termination was in retaliation for exercising his First Amendment right to speak out on a matter of public concern. German also alleges that Bailey, Shaffer, and Fox tortiously interfered with his employment contract.

## Standard of Review

The defendants have moved to dismiss German's complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for failure to state a claim upon which relief may be granted. In deciding whether to grant a motion to dismiss under Rule 12(b)(6), the court must determine "whether the complaint, under the facts alleged and under any facts that could be proved in support of the complaint, is legally sufficient." E. Shore Mkt., Inc. v. J.D. Assoc. Ltd. P'ship, 213 F.3d 175, 180 (4th Cir. 2000). The court must accept the allegations in the complaint as true, and draw all reasonable factual inferences in favor of the plaintiff. Id. The court should not dismiss a complaint for failure to state a claim, unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims that would entitle him to relief. Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

## Discussion

1. First Amendment Claim

German brings this action under 42 U.S.C. § 1983.[2] In order to establish a claim under this statute, German must prove two elements: (1) that the defendants "deprived [him] of a right secured by the Constitution or laws of the United States"; and (2) "that the alleged deprivation was committed under color of state law." American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999). In order to satisfy the "color of state law" requirement, the entity or individuals charged must either be a state actor or engage in conduct that is "fairly attributable to the state." Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982).

Here, German alleges that Bailey, a state official, coerced her co-defendants, all of whom are private actors, to terminate or bring about the termination of his employment. Because his termination was allegedly based on the four emails that German sent to state officials regarding the temporary welcome center, German alleges that he was terminated in retaliation for exercising his First Amendment right to free speech.

A plaintiff seeking to recover for First Amendment retaliation must establish three elements: (1) that his speech was protected by the First Amendment; (2) that the defendants deprived him of some valuable benefit; and (3) that there was a causal relationship between his

---

[2]Section 1983 provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

Case 5:06-cv-00119-GEC-BWC   Document 29   Filed 04/26/07   Page 10 of 15   Pageid#: 201

protected speech and the defendants' conduct. See Suarez Corp. Indust. v. McGraw, 202 F.3d 676, 686 (4th Cir. 2000); Huang v. Bd. of Governors, 902 F.2d 1134, 1140 (4th Cir. 1990). The first two factors involve questions of law, while the third factor involves an issue of fact. See Goldstein v. Chestnut Ridge Volunteer Fire Co., 218 F.3d 337, 351-352 (4th Cir. 2000).

Having reviewed the parties' arguments, the court agrees with the defendants that German's emails were not protected by the First Amendment, since they were sent pursuant to his official duties as the Director of Public Relations and Membership for the SVTA, and not in his capacity as a private citizen. Thus, even assuming that German's termination was "fairly attributable to the state," Lugar, 457 U.S. at 937, he has failed to state a claim under § 1983.

In reaching this conclusion, the court finds instructive the Supreme Court's decision in Garcetti v. Ceballos, 126 S. Ct. 1951 (2006). In Garcetti, the Court held that, as a matter of law, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Id. at 1960 (modifying the analysis for public employee First Amendment protection set forth in Pickering v. Bd. of Educ., 391 U.S. 563 (1968))[3]. In emphasizing the difference between speech made as a public citizen versus speech made as a public employee, the Court explained that restricting speech made pursuant to a public employee's official duties "simply reflects the exercise of employer control over what the

---

[3]In Pickering and its progeny, the Supreme Court identified two inquiries that must be made in determining whether a public employee's speech is constitutionally protected. See Garcetti, 126 S. Ct. at 1958. The first requires a determination of whether the employee spoke as a citizen on a matter of public concern. Id. (citing Pickering, 391 U.S. at 568). If the answer is no, the employee has no First Amendment claim. Id. (citing Connick v. Myers, 461 U.S. 138, 147 (1983)). If the answer is yes, "[t]he question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." Id. (citing Pickering, 391 U.S. at 568).

11

employer itself has commissioned or created," and "does not infringe any liberties the employee might have enjoyed as a private citizen." Id. Thus, when an employee is "simply performing his or her job duties," courts need not perform "the delicate balancing of the competing interests surrounding the speech and its consequences." Id. at 1961.

In response to the defendants' motion to dismiss, German argues that Garcetti is inapplicable to the present case, because it did not involve the termination of a private employee. However, the court finds this argument unpersuasive. While Garcetti specifically held that a public employee has no First Amendment protection for job-related "official" speech," Id. at 1960 (emphasis added), the case did not alter the general rule that private employees are generally entitled to less First Amendment protection than public employees. See Dixon v. Coburg Dairy, Inc., 369 F.3d 811, 817, n.5 (4th Cir. 2004) ("[T]he First Amendment does not apply to private employers."). To the contrary, in reaching its decision, the Supreme Court emphasized that "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions." Garcetti, 126 S. Ct. at 1958 (emphasis added). Thus, the court agrees with the defendants that Garcetti essentially affirms the right of every employer to control its employees' official job-related speech. See Id. at 1961 ("[T]he First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities.").

To support his argument that neither Garcetti nor the Pickering balancing test apply to cases involving private employees, German cites Dossett v. First State Bank, 399 F.3d 940 (8th Cir. 2005), in which the United States Court of Appeals for the Eighth Circuit declined to apply the Pickering balancing test to a private employee's § 1983 retaliation claim. However, the facts of Dossett are immediately distinguishable from this case. In Dossett, the plaintiff, a bank teller,

12

was allegedly retaliated against for speaking out, as a private citizen, at a local school board meeting; her statements were not made as part of her official duties as a teller. See Dossett, 399 F.3d at 944-945. Moreover, although the Eighth Circuit expressly declined to apply the Pickering balancing test, the Court, using Pickering language, held that the plaintiff spoke as a member of "'the citizenry in general,'" and that "her speech on matters of public concern clearly was protected by the First Amendment." Id. at 950.

The court also disagrees with German's assertion that Fourth Circuit jurisprudence demonstrates that neither Garcetti nor Pickering applies when a private employee is retaliated against for the content of his job-related speech. The first case cited by German, Blankenship v. Manchin, 471 F.2d 523 (4th Cir. 2006), did not involve a claim of First Amendment retaliation in the employment context. Moreover, the first element of the plaintiff's retaliation claim – that the plaintiff engaged in protected speech – was not in dispute. Blankenship, 471 F.2d at 528. Thus, the Fourth Circuit had no reason to analyze the plaintiff's speech under Garcetti or Pickering, or discuss whether either decision was applicable to the particular facts of the case.

Likewise, the case of Adams v. Bain, 697 F.2d 1213 (4th Cir. 1982), also cited by German, does not support German's argument. Adams involved a group of volunteer firemen who alleged that they were fired in retaliation for publicly criticizing the fire department's operations at a county meeting. Adams, 697 F.2d at 1215-1216. The case was dismissed by the district court on the basis that the volunteer fire department was a private entity, and that there was no state action. Id. at 1216. Thus, the only issue on appeal was "not whether the appellants' First or Fourteenth Amendment rights [were] violated, but whether the appellees' actions as alleged in the complaint [could] fairly be seen as state action." Id. at 1217. The Fourth Circuit emphasized that the Court was not concerned with the issue of whether the appellees' actions

13

were constitutionally permissible under the First Amendment, and that the First Amendment issue would have to be resolved at trial. Id. In so doing, the Fourth Circuit specifically cited to Pickering in a footnote, suggesting that the Pickering analysis would ultimately apply. Id. at n. 3.

The court notes that the United States District Court for the Southern District of Indiana recently applied Garcetti in a case similar to this one. In Logan v. Ind. Dept. of Corrections, 2006 U.S. Dist. LEXIS 43631, *5 (S.D. Ind. June 26, 2006), the Court considered the applicability of Garcetti in a "hybrid situation, [where] a private employee [is] suing her private employer based upon a claim that her supervisor conspired with the State . . . to violate her First Amendment rights." Relying on Garcetti, the Court ultimately held that the plaintiff's speech fell outside the scope of First Amendment protection, since it consisted of statements made pursuant to the plaintiff's official job responsibilities. Id. at *8.

In this case, German's emails were clearly drafted and sent to state officials as part of his official duties as the SVTA's Director of Public Relations and Membership. German acknowledges in his complaint that his job duties included "working with state and local officials." (Compl. at ¶ 9.) In the first email, German followed up with Senator Hanger regarding the SVTA members' complaints regarding the temporary welcome center. Likewise, in the second email, German communicated the SVTA's concerns to Alisa Bailey and Connie Sorrell. German sent copies of both emails to the Executive Director of the SVTA. In the third and forth emails, German used the term "we" to refer to the SVTA, and in all four emails, German closed his message with a formal signature including the SVTA's name, address, telephone number, and website address. Because the content, form, and context of these emails clearly show that they were sent pursuant to German's official duties with the SVTA, and that he was not merely speaking as a member of the "citizenry in general," Pickering, 391 U.S. at 568,

German's emails are not entitled to First Amendment protection. See Garcetti, 126 S. Ct. at 1960; see also Urofsky v. Gilmore, 216 F.3d 401, 407 (4th Cir. 2000) ("[C]ritical to a determination of whether employee speech is entitled to First Amendment protection is whether the speech is made primarily in the employee's role as a citizen or primarily in his role as employee.") (internal quotations omitted). Thus, German's termination was not unconstitutional and he has failed to state a claim under § 1983. For these reasons, the court will grant the defendants' motions to dismiss with respect to German's First Amendment claim.

2. Tortious Interference Claim

German also asserts a claim under Virginia law for tortious interference with his employment contract. Having determined to dismiss German's claim under § 1983, the court declines to exercise supplemental jurisdiction over this claim. See 28 U.S.C. § 1367(c). Accordingly, German's tortious interference claim will be dismissed without prejudice.

**Conclusion**

For the reasons stated, the court will grant the defendants' motions to dismiss. The Clerk is directed to send certified copies of this opinion and the accompanying order to all counsel of record.

ENTER: This 26th day of April, 2007.

*/s/ Judge Conrad*
United States District Judge

15